**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION**

| | |
|---|---|
| **MELANIE ROBINSON,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v.  ) | **CIVIL ACTION NO. 5:12-CV-390 (MTT)** |
| ) | |
| **ARMSTRONG WORLD INDUSTRIES,** ) | |
| **INC.,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

## <u>ORDER</u>

Plaintiff Melanie Robinson, who is African American, is claiming race

discrimination and retaliation in violation of Title VII and 42 U.S.C. § 1981 based on her

termination from Defendant Armstrong World Industries' plant in Macon, Georgia.[1]

Armstrong has moved for summary judgment on all of Robinson's claims.  (Doc. 24).

For the following reasons, the motion is **GRANTED in part and DENIED in part**.

## I. FACTUAL BACKGROUND

### A.  Robinson's Employment

On July 28, 2008, Robinson was hired as a salaried process engineer at

Armstrong's Macon plant, which manufactures ceiling tiles.  (Doc. 24-3, ¶¶ 6, 11).  Prior

to her employment at Armstrong, Robinson obtained her undergraduate degree in

chemical engineering from Carnegie Mellon University and a masters in chemical

engineering from Louisiana State University.  (Doc. 24-3, ¶ 12).  Erica Kemp, the

process engineering and quality manager, was Robinson's supervisor throughout her

---

[1] Though Armstrong believed the complaint also alleged a claim for hostile work environment,
Robinson has clarified she is not pursuing a hostile work environment claim.

employment.  (Doc. 24-3, ¶ 13).  Kemp supervised a group of six to seven process engineers and technicians.  (Doc. 24-3, ¶ 4).[2]  Process engineers implement improvements in the manufacturing processes for ceiling tiles and ensure the tiles are produced in accordance with quality specifications.  (Doc. 24-3, ¶ 4).  They are often assigned to a specific part of the manufacturing process and may be assigned specific engineering projects that vary in time and duration.  (Doc. 24-3, ¶ 5).  In addition to reporting to Kemp, process engineers have "dotted-line" reporting responsibility to the manager for the area to which they are assigned.  (Doc. 24-3, ¶¶ 8-9).  They do not typically manage or supervise other employees.  (Doc. 24-3, ¶ 5).

Each morning, Armstrong's managers and engineers for each manufacturing line meet to review the plant's operations for the past 24 hours and report any safety, quality, delivery, or cost issues ("SQDC meetings").  (Docs. 24-3, ¶¶ 22-23; 22 at 25:11-17).  Process engineers are responsible for reporting quality issues at the SQDC meetings.[3]  (Doc. 24-3, ¶ 24).  Employees rely on Infinity, Armstrong's computer database, which contains the pertinent data for successful operation of the production lines.  (Doc. 24-4, ¶ 8).  Infinity presents color-coded data so that problems can easily be spotted.  If data are green, product specifications have been met.  If the data are red, specifications have not been met.  (Doc. 24-4, ¶ 9).

Kemp attended most SQDC meetings for each manufacturing line, and Robinson attended the SQDC meetings for the manufacturing line to which she was assigned.

_____

[2] The only difference in the two positions is that process engineers have a four year undergraduate engineering degree, whereas technicians have a two year technical degree coupled with years of work experience.  (Doc. 24-3, ¶ 5).  For simplicity's sake, the Court will refer to the group of employees as "process engineers."

[3] As discussed in more detail below, Robinson contends she was only responsible for reporting certain quality issues.

(Docs. 24-3, ¶ 23).  In 2011, Robinson worked in the Fabrication department and provided engineering support for certain manufacturing operations.  (Docs. 24-3, ¶ 9; 24-4, ¶ 14).  Charity Stevens became the manager of the area to which Robinson was assigned in early September 2011, and Robinson had dotted-line reporting responsibility to her.  (Docs. 22 at 18:23-19:15, 40:25-41:2; 24-3, ¶ 9).

### B. The "Sticking" Problem

In the spring of 2011, Armstrong began receiving customer complaints that ceiling tiles with product numbers 793/794 and 860/861 manufactured at its Macon plant were sticking together.  (Doc. 24-3, ¶ 17).  The tiles are packaged with the painted sides facing each other, and they would tear when customers attempted to separate them. (Doc. 24-3, ¶ 17).  Kemp assigned this project to Robinson, who was tasked with identifying the cause of the sticking and resolving it.  (Doc. 24-3, ¶ 18).  Robinson contends she did not have sole responsibility for solving the sticking problem and that she relied on Kemp, as well as the team Robinson assembled, to aid her.  (Doc. 22 at 64:8-24).[4]

On June 1, 2011, Robinson initiated a "Quick Kaizen," a process where she assembled a team of five hourly employees to work on the problem.  (Docs. 24-3, ¶ 19; 22 at 65:17-66:2).  As the leader of the team, Robinson developed a plan to cure the sticking problem.  (Doc. 24-3, ¶¶ 19-20, pp. 16-17).  The Quick Kaizen sheet Robinson prepared sets forth the problem, possible causes, action items, and system checks. (Doc. 24-3 at 17).  She determined that increasing the temperature of the ceiling tile

---

[4] Robinson also maintains she relied on employee Glenda Davis to report on the maintenance of the ovens and on employee Wayne Garrard to report on the paint formula being used for the ceiling tiles.  (Doc. 22 at 77:2-19, 95:25-96:5).  As it turns out, Armstrong ultimately resolved the sticking issue by changing the paint formula with Garrad's assistance.  (Doc. 29-2 at 4).

boards would resolve the sticking problem and established a temperature specification of 260 degrees Fahrenheit for the face of the boards. (Doc. 24-3, ¶ 20). To achieve this board face temperature, Robinson had the oven temperatures increased from 600 to 650 degrees for products 860/861 and from 625 to 725 degrees for products 793/794. (Docs. 24-3, ¶ 20; 22 at 86:24-89:23).

Believing that Robinson had resolved the sticking issues with products 793/794 and 860/861, Armstrong resumed production. (Doc. 24-3, ¶ 21). However, the ovens were consistently unable to reach the temperature specifications in order for the board face temperature to reach 260 degrees from mid-June 2011 to October 2011. (Docs. 24-3 at 24-26; 24-4, ¶ 17).

### C. Robinson's Suspension and Termination

On October 19, 2011, process technician Ronnie Johnson, who was filling in for Robinson, reported that the board face temperature data in Infinity was red and thus not meeting specifications. Armstrong contends this is the first time Robinson's supervisors learned about the out-of-compliance temperatures. (Docs. 24-3, ¶¶ 28-29; 24-4, ¶¶ 16-17; 22 at 46:5-21). According to Armstrong, Robinson was responsible for reporting temperature issues at the SQDC meetings and she had failed to do so. By this time, Armstrong had produced over 700,000 square feet of defective ceiling tiles. (Doc. 24-3, ¶ 40). Robinson maintains she was only responsible for reporting issues with "key quality variables" at the SQDC meetings and that face temperature was not a key quality variable. (Doc. 22 at 52:5-11, 110:11-20, 113:1-18). She further contends management was aware of the ongoing problem with ovens not being able to reach the specified temperature prior to October 19. (Doc. 22 at 46:25-48:4, 105:14-20).

-4-

However, it is undisputed Robinson did not report the "red checks" for temperature at the SQDC meetings.

After the October 19 morning meeting, Stevens and Kemp convened a 3:00 p.m. meeting with Robinson and Johnson to determine how the quality issue went unnoticed for so long and how Robinson determined a higher temperature would solve the sticking problem in the first place.  (Docs. 24-3, ¶ 30; 24-4, ¶¶ 17-18).  After this meeting, Stevens and Kemp determined that Robinson's failure to report the temperature checks amounted to falsification of data and that the procedures she used to come to a solution for the sticking project were inadequate.[5]   (Docs. 24-3, ¶¶ 32-33, 37; 24-4, ¶¶ 17-19).  The next day, Robinson was suspended.  (Doc. 24-3, ¶ 41).

On October 27, 2011, Robinson was interviewed by the human resources manager, Tim Colwell.  (Docs. 24-1, ¶ 11; 22 at 210:11-21).  According to Colwell, Robinson acknowledged in this interview that she had not monitored the board face temperature because she had not been specifically told to, that she "lost track of the face temperature," and that she reported there were no issues with Infinity at the morning meetings.  (Doc. 24-1, ¶ 14).  She also insisted to Colwell that she never falsified data and complained Kemp and Stevens were assaulting her character.  (Doc. 24-1, ¶ 15).  Robinson maintains her actions in not following up with the face temperatures were the result of Kemp telling her the sticking project was no longer a priority.  (Doc. 22 at 115:4-22).

---

[5] As discussed below, Robinson disputes any data was falsified because she was not required to report on temperature daily and disputes that her engineering work was inadequate because it was approved by Kemp.

Armstrong claims that by October 27, all managers at the Macon plant that needed to have input had reviewed and approved Robinson's termination and that the only remaining step was to review the decision with Armstrong's corporate office. (Doc. 24-1, ¶¶ 3, 16-18). Members of the management team, including Stevens, Kemp, Colwell, and plant manager Mike Winters, recommended and participated in the termination decision. (Docs. 24-1, ¶¶ 16-17; 24-3, ¶ 41; 24-4, ¶ 21). However, according to Armstrong, the termination process was put on hold because Robinson filed an ethics complaint the day after she met with Colwell.[6]

**D. Ethics Complaint**

On October 28, 2011, Robinson called Armstrong's toll free hotline and filed an ethics complaint. (Doc. 24-2, ¶ 4, pp. 7-8). According to the report generated as a result of her call, Robinson alleged racial discrimination had been ongoing at the Macon plant for two or three years. Robinson reported she felt she did not get the same support as Caucasian employees. She made a specific allegation of racial discrimination involving African American process engineer Darius Holt, contending that in September 2011 he was reprimanded by either Kemp or Stevens (both of whom are Caucasian) for not performing a certain check. However, Robinson said the check had not been performed since before Holt began working and that Caucasian process engineer Ronnie Johnson, who was in charge of the particular line before Holt, was not reprimanded for failing to perform the check. (Doc. 24-2 at 7). Robinson also complained about Kemp and Stevens accusing her of falsifying data, stating Stevens told her that she and supervisor Glenda Davis were equally responsible for failing to

---

[6] Colwell states he cannot remember whether he first contacted the corporate office prior to or after October 27, and though he says he received approval to terminate Robinson after her interview, he does not specify when. (Doc. 24-1, ¶ 18).

report the temperature red checks.  She also stated she did not have any support when she was working on the sticking project but that Johnson, who was now assigned the sticking project, was receiving support from Stevens.  (Doc. 24-2 at 7).

Compliance specialist Jana Keck investigated Robinson's complaints.  According to Keck, Robinson admitted during a phone conversation on November 1, 2011 that: she never followed up after recommending a temperature increase to confirm if the equipment was capable, she did not run additional tests to see if the temperature specification was being met or if the boards were sticking together, and she did not report the temperature checks at the daily meetings because she was busy with higher priority items.  (Doc. 24-2, ¶¶ 6-7).  Robinson does not dispute the substance of this conversation, but she claims Kemp did not tell her to do a "capability run" to see if the ovens were capable of meeting the temperature specifications and that Kemp told her she wanted the sticking issue solved quickly.  (Doc. 22 at 105:8-106:14).  After her investigation, Keck informed Robinson she did not find any violation.  (Doc. 24-2, ¶ 10). On November 9, 2011, Armstrong terminated Robinson's employment.  (Docs. 24-1, ¶ 23; 24-3, ¶ 42).

## II. DISCUSSION

### A.  Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A factual dispute is not genuine unless, based on the evidence presented, "a reasonable jury could return a verdict for the nonmoving party."  *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir.

2002); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The movant must

cite "to particular parts of materials in the record, including depositions, documents,

electronically stored information, affidavits or declarations, stipulations (including those

made for purposes of the motion only), admissions, interrogatory answers, or other

materials."  Fed. R. Civ. P. 56(c)(1)(A).

 The burden then shifts to the non-moving party, who must rebut the movant's

showing "by producing … relevant and admissible evidence beyond the pleadings."

*Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1315 (11th Cir. 2011)

(quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  The non-moving party

does not satisfy her burden "if the rebuttal evidence is merely colorable, or is not

significantly probative of a disputed fact."  *Id.* (quoting *Anderson*, 477 U.S. at 249-50).

Further, where a party fails to address another party's assertion of fact as required by

Fed. R. Civ. P. 56(c), the Court may consider the fact undisputed for purposes of the

motion.  Fed. R. Civ. P. 56(e)(2).  However, "credibility determinations, the weighing of

the evidence, and the drawing of legitimate inferences from the facts are jury functions,

not those of a judge. … The evidence of the non-movant is to be believed, and all

justifiable inferences are to be drawn in [her] favor."  *Anderson*, 477 U.S. at 255.

 **B.  Armstrong's Objections to the Hillman Declaration**

 In response to Armstrong's motion for summary judgment, Robinson relies in part

on the declaration of Armstrong employee Jonathan Jay Hillman.  Armstrong objects to

the declaration in its entirety, contending Robinson failed to identify Hillman as a

witness pursuant to Fed. R. Civ. P. 26(a); Hillman's declaration does not comply with

Fed. R. Civ. P. 56(c) because it is speculative, conclusory, and not based on personal

knowledge; and Hillman's affidavit contradicts Robinson's previous admissions against interest.

Rule 26 requires parties to make certain initial disclosures without awaiting a discovery request, including "the name and, if known, the address and telephone number of each individual likely to have discoverable information … that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment." Fed. R. Civ. P. 26(a)(1)(A)(i). Further, the rule requires a party to supplement or correct her disclosures "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Fed. R. Civ. P. 26(e)(1)(A). According to Armstrong, Robinson first identified Hillman when responding to its motion for summary judgment.

Robinson does not contest that she did not supplement her disclosures to identify Hillman, but she argues it was unnecessary because Hillman's identity was made known to Armstrong during the discovery process. Specifically, Robinson provided a memorandum she prepared at the time of her suspension and termination to Armstrong in response to its request for production of documents.[7] Hillman is listed as a "witness" that Robinson told Keck to interview during her ethics violation investigation. (Doc. 22-1 at 14). Robinson also identified Hillman during her September 17, 2013 deposition as a relief supervisor for the product line on which she was working. (Doc. 22 at 61:5-16).

---

[7] Armstrong introduced this memorandum as Defendant's Exhibit 7 during Robinson's deposition. (Doc. 22-1 at 8-14).

Further, she testified about staying in contact with him after she was fired and stated he knew about the ultimate cause of the sticking problem.  (Doc. 22 at 78:1-79:9).

Pursuant to Fed. R. Civ. P. 37(c)(1), "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."  The Court finds Robinson should have disclosed Hillman's identity pursuant to Rule 26, especially in light of the fact she believed he had relevant information before she filed this lawsuit.  However, Armstrong cannot claim it was prejudiced by this failure to disclose or that Hillman's identity did not become known to it during the discovery process.  Robinson certainly has an obligation to disclose witnesses she might use to support her claim, but Armstrong knew Hillman's identity months before filing its motion for summary judgment.  Thus, the Court concludes the failure is harmless and will not decline to consider Hillman's declaration on this ground.

Armstrong's other objections—that the declaration fails to comply with Rule 56(c) and that the declaration contradicts Robinson's previous admissions—are directed to specific paragraphs.  The Court will address the individual objections as they arise.

### C. Robinson's Claims

#### 1. *McDonnell Douglas* Framework

A Title VII plaintiff may prove her case directly or circumstantially.  Here, there is no direct evidence of discrimination, so the Plaintiff must rely on circumstantial evidence.  The framework for analyzing circumstantial evidence to establish a prima facie case of discrimination is provided in *McDonnell Douglas Corp. v. Green*, 411 U.S.

792 (1973).  Pursuant to *McDonnell Douglas*, a plaintiff must first establish a prima facie case of discrimination, the test for which differs slightly for each claim.  If a plaintiff establishes a prima facie case of discrimination, the burden of production, but not the burden of persuasion, shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employment action.  *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254-55 (1981).  This burden of production means the employer "need not persuade the court that it was *actually* motivated by the proffered reasons" but must produce evidence sufficient to raise a genuine issue of fact as to whether it discriminated against the plaintiff.  *Kragor v. Takeda Pharm. Am., Inc.*, 702 F.3d 1304, 1308 (11th Cir. 2012) (emphasis added) (internal quotation marks and citation omitted).

A plaintiff then has the opportunity to show that the employer's stated reason is in fact pretext for discrimination.  "The plaintiff can show pretext 'either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'"  *Id.* (quoting *Burdine*, 450 U.S. at 256).  Put another way, "[a] plaintiff may … survive summary judgment by 'presenting evidence sufficient to demonstrate a genuine issue of material fact as to the truth or falsity of the employer's legitimate, non-discriminatory reasons.'"  *Freeman v. Perdue Farms Inc.*, 496 F. App'x 920, 925 (11th Cir. 2012) (quoting *Evans v. McClain of Ga., Inc.,* 131 F.3d 957, 965 (11th Cir.1997)). "If the employer proffers more than one legitimate, nondiscriminatory reason, the plaintiff must rebut each of the reasons to survive a motion for summary judgment." *Crawford v. City of Fairburn, Ga.*, 482 F.3d 1305, 1308 (11th Cir. 2007) (citation omitted).

### 2. Race Discrimination

Title VII makes it unlawful for an employer to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C. § 2000e-2(a)(1). The same analytical framework and proof requirements apply to Robinson's claim of race discrimination under 42 U.S.C. § 1981. *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998). Thus, the Court's analysis of Robinson's Title VII race discrimination claim also applies to her § 1981 claim. To establish a prima facie case for race discrimination, Robinson must show that: (1) she is a member of a protected class; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) she was replaced by a person outside her protected class or was treated less favorably than a similarly-situated individual outside her protected class. *Maynard v. Bd. of Regents of the Div. of Univs. of the Fla. Dep't of Educ.*, 342 F.3d 1281, 1289 (11th Cir. 2003).

It is not contested that Robinson was a member of a protected class, suffered an adverse employment action, and was replaced by someone outside her protected class.[8] Instead, Armstrong contends Robinson cannot meet the second element of the prima facie case because she was not meeting her supervisors' legitimate job expectations. The conduct Armstrong relies on to assert Robinson was not qualified for her position is the same conduct it relies on to assert it had a legitimate nondiscriminatory reason for terminating her—that she was not monitoring and reporting

---

[8] Robinson has also presented evidence of comparators, but because she was replaced by someone outside her protected class, the Court need not consider her comparator evidence at this point.

the temperature readings for the 793/794 and 860/861 products and that the process

she used to establish the temperature standard was inadequate.

To determine whether a plaintiff is qualified for a particular position in the Title VII

context, courts focus on the plaintiff's skills and background. *Clark v. Coats & Clark,*

*Inc.*, 990 F.2d 1217, 1227 (11th Cir. 1993).  Generally it is not appropriate to rely on the

same allegation of poor performance asserted as a legitimate nondiscriminatory reason

for termination to show a plaintiff was not qualified for the position.  In *Damon v.*

*Fleming Supermarkets of Florida, Inc.*, the Eleventh Circuit explained:

> In finding the Appellants unqualified, the district court incorrectly
> considered Fleming's allegations of Appellants' poor performance.  Our
> caselaw quite clearly instructs that plaintiffs, who have been discharged
> from a previously held position, do not need to satisfy the *McDonnell*
> *Douglas* prong " 'requiring proof of qualification.' "  *Young v. General*
> *Foods Corp.,* 840 F.2d 825, 830 n. 3 (11th Cir.1988) (quoting *Rosenfield*
> *v. Wellington Leisure Products, Inc.,* 827 F.2d 1493, 1495 n. 2 (11th
> Cir.1987)).  We have explained that the " 'reason for this modification [of
> *McDonnell Douglas* ] is that in cases where a plaintiff has held a position
> for a significant period of time, qualification for that position sufficient to
> satisfy the test of a prima facie case can be inferred.' "  *Young,* 840 F.2d at
> 830 n. 3 (quoting *Rosenfield,* 827 F.2d at 1495 n. 2).  We also have
> unambiguously held that allegations of poor performance against plaintiffs
> discharged from long-held positions may be properly considered, only
> *after* a prima facie case has been established, when a court evaluates the
> pretextual nature of an employer's proffered nondiscriminatory reasons for
> termination.  *See Clark,* 990 F.2d at 1227 (holding that evidence of
> employee's performance reprimands does not establish that employee
> was unqualified, but may indicate company was legitimately concerned
> about employee's performance); *Young,* 840 F.2d at 830 n. 3 (same).  The
> district court therefore erred in concluding that Appellants were not
> "qualified" based on Fleming's allegations of poor performance.

196 F.3d 1354, 1360 (11th Cir. 1999).  As the Sixth Circuit has observed, "forcing

plaintiffs to make such a proof at the prima facie stage defies the very purpose of the

production stage and the overall sequence of *McDonnell Douglas.*"  *Cline v. Catholic*

*Diocese of Toledo*, 206 F.3d 651, 665 (6th Cir. 2000).

-13-

Armstrong cites *Baker v. Sears, Roebuck & Co.*, 903 F.2d 1515 (11th Cir. 1990) where the Eleventh Circuit held an ADEA plaintiff failed to meet her prima facie case to show she was qualified for the position in question.  In that case, the court explained that ADEA plaintiffs are entitled to an inference of qualification if they have held the position for a number of years without complaint.  *Id.* at 1520.  However, for seven of the years the plaintiff worked in the defendant's appliance department, she received poor reports for her sales of maintenance agreements.  The record showed the defendant required its employees to maintain a sales quota for maintenance agreements.  Additionally, the plaintiff was warned about the possibility of being transferred in the months preceding the transfer that prompted her lawsuit.  *Id.*

But even assuming *Baker* stands for the proposition that an employer's assertion of poor job performance can properly be considered at the prima facie stage of the analysis to determine whether an employee is "qualified," the Court finds Robinson has met her burden.  Unlike *Baker*, there is not clear record evidence of repeated failures to meet specified job criteria.[9]  Robinson has two engineering degrees, her performance was rated "fully effective" by her supervisor in March 2011, and her 2011 Promise Update Report contained positive comments from her supervisor.  (Doc. 22-1 at 23, 34).  Thus, the fact-finder could reasonably conclude Robinson was qualified for the position. *See Burdine*, 450 U.S. at 253 ("The burden of establishing a prima facie case of disparate treatment is not onerous.").

Because Robinson has met her burden at the first stage of the analysis, the Court considers whether Armstrong has met its burden to articulate a legitimate

---

[9] In her affidavit, Kemp states Robinson's job performance was less than satisfactory when she first started working at Armstrong but that she was transferred to a different area of the plant and her performance improved.  (Doc. 24-3, ¶ 14).

nondiscriminatory reason for firing her.  Armstrong asserts Robinson was fired because her job performance in conjunction with the sticking project was unacceptable and caused it to produce over 700,000 feet of ceiling tile that had to be destroyed, which amounted to a loss of more than $150,000.  Based on Armstrong's statement of material facts and employee affidavits submitted with its motion, it is apparent Armstrong is asserting two reasons for firing Robinson related to her performance on the sticking project: (1) Robinson's poor engineering work to implement a solution to the sticking problem; and (2) her failure to monitor and report that the temperature specifications she implemented were not being met.  By producing affidavits of Robinson's two supervisors and the human resources manager at Armstrong's Macon plant, each of whom assert these are the reasons Robinson was terminated, Armstrong has met its burden of production.  Thus, Robinson must rebut each proffered reason.

The Court finds Robinson has created a genuine issue of fact on whether Armstrong's first reason is a pretext for discrimination.  At their 3:00 p.m. October 19 meeting, Kemp and Stevens reviewed the data Robinson used to implement a solution to the sticking problem.  Armstrong contends they then decided her engineering work was incompetent based on her use of inadequate test data to establish a board face temperature standard, her failure to conduct a capability run after setting the temperature specifications, and her implementation of a temperature standard the ovens could not achieve.  (Docs. 24-3, ¶¶ 31-33; 24-4, ¶¶ 17-18).  However, Robinson has created a genuine issue of fact as to whether this was Armstrong's real reason for terminating her.  According to Robinson, Kemp not only approved her Process Change Review to increase the temperature specifications, but she was also involved in the

process.  Robinson contends Kemp is the one who suggested making sure the board

face temperature was higher than the 212-degree boiling point of water.  (Doc. 22 at

90:18-91:11).  Additionally, Robinson asserts she informed Kemp and Stevens'

predecessor, David White, that the ovens had problems maintaining temperatures,

which Armstrong does not dispute.  (Docs. 22 at 47:16-48:4, 91:12-15; 32 at 10).

Because Robinson has presented evidence that Kemp, Robinson's main supervisor and

one of the managers involved in the decision to terminate her, previously participated in

and approved of the same engineering work, a reasonable fact-finder could determine

Armstrong's first asserted reason is not the real reason for her termination.  *Cf. Alvarez*

*v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010) ("The question is

not whether it really was [the plaintiff's] fault. …The question is whether her employers

were dissatisfied with her for these or other non-discriminatory reasons, even if

mistakenly or unfairly so, or instead merely used those complaints about [her] as cover

for discriminating against her … .").

     Robinson has also created a genuine issue of fact on the truth of Armstrong's

second proffered reason by presenting evidence she was not responsible for the

temperature checks in question.  In her deposition, Robinson states that as a process

engineer she was only responsible for daily checking and reporting on "key quality

variables," which included color, warp, gloss, size, and squareness.  (Doc. 22 at 33:17-

24, 36:1-9).[10]  Hillman also states in his declaration that Robinson's responsibility at

daily SQDC meetings was to report on the variables listed above.  (Doc. 27-2, ¶ 4).

---

[10] Robinson apparently relied on a document entitled "Line Support Data Review Expectations"
to determine what her reporting responsibilities were, but this document was not submitted in
conjunction with the summary judgment motion or the response.  She states that Kemp emailed
her this document at some point, but she cannot remember the date.  (Doc. 22 at 33:25-34:18).

According to Hillman, board face and oven temperature were the responsibility of line operators or supervisors to monitor and report on at meetings.  (Doc. 27-2, ¶ 4).

Armstrong objects to Robinson's deposition testimony under the "sham affidavit doctrine" as contradicting previous admissions against interest.  In this circuit, "'[w]hen a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony.'"  *Allen v. Bd. of Pub. Educ. for Bibb Cnty.*, 495 F.3d 1306, 1316 (11th Cir. 2007) (quoting *Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc.*, 736 F.2d 656, 657 (11th Cir. 1984)).  However, the Court must be careful not to get into the credibility of the evidence, which is the province of the fact-finder.  Thus, the Court must "find some inherent inconsistency between an affidavit and a deposition before disregarding the affidavit."  *Id.* (internal quotation marks and citation omitted).

According to Armstrong, Robinson's deposition testimony that she was not responsible for the temperature checks directly contradicts her previous unsworn statements to her supervisors and sworn statement to the EEOC that she failed to monitor the temperature specifications because they "fell off her radar."  (Doc. 22-1 at 16-17).  The Court need not decide whether the sham affidavit doctrine is even applicable in this context because the previous statements are not inherently inconsistent with Robinson's deposition testimony.[11]  Robinson does not claim she actually monitored the temperature readings; instead, she states to do so was not her

---

[11] Armstrong also fails to mention that in the same EEOC statement Robinson also states, "I did not bring this fact up at the morning meeting because this wasn't one of the checks that I was required to, or normally reported out on at the morning meeting, thus I spoke honestly on all finish quality measures that I audited in the morning."  (Doc. 22-1 at 17).

responsibility.  Whether this testimony is credible in light of her statement that the temperature fell off her radar is a question for the fact-finder.

Armstrong also argues the paragraph of Hillman's declaration stating Robinson was not responsible for the temperature checks is not based on personal knowledge and contradicts Robinson's previous admissions against interest.  The Court concludes Hillman's personal knowledge can be inferred based on his position at Armstrong and his attendance at these meetings.  *See* Doc. 27-2, ¶ 4 (stating he was a relief supervisor and attended the morning SQDC meetings).  Additionally, Armstrong's "sham affidavit" objection suffers from the same infirmity as its identical objection to Robinson's deposition testimony: the two statements are not inherently inconsistent.

The Court finds Robinson's evidence that she was not responsible for the temperature checks calls into doubt the truthfulness of Armstrong's second proffered reason for her termination.  The question is not whether Robinson actually monitored the temperature (she has admitted her failure to do so) but whether Armstrong actually terminated her for this reason.[12]

---

[12] Robinson also submits the following to show pretext: (1) Armstrong's reasons for terminating her changed; (2) comparators outside her protected class were treated more favorably for similar conduct; (3) Stevens, who was involved in the decision to terminate her, made discriminatory statements and treated other African American process engineers unfavorably; (4) Armstrong failed to properly investigate her ethics line complaint; and (5) Armstrong has a record of underrepresentation of African Americans as process engineers or in other salaried positions.  For various reasons that do not warrant a lengthy discussion, these categories are either not based on admissible evidence or are not probative of pretext.  Because the Court finds Robinson has created a genuine issue of fact on whether Armstrong's proffered reasons for terminating her are a pretext for discrimination, it is also unnecessary to address Robinson's argument that she may survive summary judgment under the alternative *Lockheed-Martin* analysis.  *See Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011) (recognizing the *McDonnell Douglas* framework is not the "*sine qua non*" for a plaintiff to survive a summary judgment motion in an employment discrimination case and that "[a] triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker" (internal quotation marks and citation omitted)).

Though the evidence Robinson has produced to rebut Armstrong's proffered legitimate nondiscriminatory reasons only goes to their truthfulness and does not directly address whether discrimination was the real reason for her termination, summary judgment is still not appropriate. Citing *St. Mary's Honor Center v. Hicks,* 509 U.S. 502 (1993), some courts suggest that a plaintiff responding to an employer's motion for summary judgment must prove that the employer's legitimate, nondiscriminatory reason is false *and* that discrimination was the real reason for the employer's action. *See Upshaw v. Ford Motor Co.*, 576 F.3d 576, 587 (6th Cir. 2009); *Brooks v. Cnty. Comm'n of Jefferson Cnty.*, 446 F.3d 1160, 1163 (11th Cir. 2006); *Maxfield v. Cintas Corp. No. 2,* 427 F.3d 544, 550-51 (8th Cir. 2005). However, the Supreme Court in *St. Mary's* did not address a plaintiff's burden at the summary judgment stage. Rather, the Court addressed whether an employee is entitled to judgment as a matter of law when the fact-finder has concluded that the employer's nondiscriminatory reason is false, but nevertheless found that the employer did not intentionally discriminate against the plaintiff. Moreover, as noted by Judge Wilson in his concurring opinion in *Convoy v. Abraham Chevrolet-Tampa, Inc.,* 375 F.3d 1228, 1236 (11th Cir. 2004), the Supreme Court in *St. Mary's* "flatly rejected the so-called 'pretext-plus' approach to discrimination analysis, which had required the plaintiff not only to demonstrate that the employer's asserted reasons were pretextual, but also to introduce additional evidence of discrimination."

In *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133 (2000), the Supreme Court disposed of any lingering viability of pretext-plus analysis. While it is true the plaintiff must ultimately prove intentional discrimination, "it is *permissible* for the

trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation." *Id.* at 147. In a concurring opinion, Justice Ginsburg, in a summary of the majority's holding, wrote that a plaintiff "*may* survive judgment as a matter of law by submitting two categories of evidence: first, evidence establishing a 'prima facie case,' ...; and second, evidence from which a rational factfinder could conclude that the employer's proffered explanation for its actions was false." *Id.* at 154. *See also Dulin v. Bd. of Comm'rs of Greenwood Leflore Hosp.*, 657 F.3d 251, 251-52 (5th Cir. 2011).

Of course, the Supreme Court in *Reeves* also noted that "there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory." *Reeves*, 530 U.S. at 148. The Court gave as examples "if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred." *Id.* However, this is not such a case. Unlike other cases where the Eleventh Circuit has found merely discrediting the employer's reason at the summary judgment stage is not enough, there is no clear record evidence of another non-proffered reason for the employer's actions. *See Chapter 7 Tr. v. Gate Gourmet, Inc.*, 683 F.3d 1249, 1257 (11th Cir. 2012) (employer entitled to summary judgment on race discrimination claim because pretext evidence supported inference of *pregnancy* discrimination); *Alvarez*, 610 F.3d at 1267 (employer entitled to summary judgment on national origin discrimination claim because record established beyond genuine dispute that employee was fired for failing to satisfy her

persnickety supervisor).  Robinson's prima facie case, plus her evidence that

Armstrong's proffered explanations of its actions are false, is enough for her to survive

summary judgment on her discrimination claim.  *Cf. Kragor*, 702 F.3d at 1311 (holding

that decisionmaker's post-termination statement that employee should not have been

fired and did everything right combined with prima facie case was enough to create jury

question on the ultimate issue of discrimination).

### 3.  Retaliation

Under Title VII, an employer may not retaliate against an employee because the

employee "has opposed any practice made an unlawful employment practice by this

subchapter, or because [s]he has made a charge, testified, assisted, or participated in

any manner in an investigation, proceeding, or hearing under this subchapter."  42

U.S.C. § 2000e-3(a).  The Court's analysis of Robinson's Title VII retaliation claim also

applies to her § 1981 retaliation claim.  *See Goldsmith v. Bagby Elevator Co.*, 513 F.3d

1261, 1277 (11th Cir. 2008).  To establish a prima face case of retaliation, a plaintiff

must show that "(1) she engaged in statutorily protected activity; (2) she suffered a

materially adverse action; and (3) there was a causal connection between the protected

activity and the adverse action."  *Gate Gourmet*, 683 F.3d at 1258 (internal quotation

marks and citation omitted).  For the causal element of the prima facie case, "a plaintiff

merely has to prove that the protected activity and the negative employment action are

not completely unrelated."  *Id.* at 1260 (internal quotation marks and citations omitted).[13]

---

[13] The Court need not decide whether the Supreme Court's decision in *University of Texas Southwestern Medical Center v. Nassar*, 133 S. Ct. 2517 (2013), where the Court held the plaintiff must prove retaliation for protected conduct was the but-for cause of the adverse action, affects the causation requirement for the prima facie case.  Robinson has failed to meet the pre-*Nassar* causation requirement.

"[C]lose temporal proximity may be sufficient to show that the protected activity and the adverse action were not wholly unrelated." *McCann v. Tillman*, 526 F.3d 1370, 1376 (11th Cir. 2008) (internal quotation marks and citation omitted). If a plaintiff makes out a prima facie case of retaliation, the burden shifts to the employer to articulate legitimate reasons for the challenged action, and, if the employer does so, a plaintiff has the ultimate burden of showing by a preponderance of the evidence that the employer's reasons were pretextual. *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001).

Armstrong does not challenge the first two elements of the prima facie case. Instead, it contends Robinson has not established the requisite causal connection between her protected conduct and the adverse action. According to Armstrong, the decision to terminate Robinson was already made on October 27, 2011, the day before she filed her ethics complaint, and the only remaining step was for the decision to be reviewed by Armstrong's corporate office. Robinson disputes that the decision was already made. She argues a jury could reasonably find that she was suspended pending an investigation and that the suspension would have ended but for the filing of her ethics complaint.

Regardless of when the decision was finalized, it is clear that Armstrong was considering terminating Robinson before she filed her ethics complaint on October 28. In *Drago v. Jenne*, the Eleventh Circuit held that "in a retaliation case, when an employer contemplates an adverse employment action before an employee engages in protected activity, temporal proximity between the protected activity and the subsequent adverse employment action does not suffice to show causation." 453 F.3d 1301, 1308

(11th Cir 2006).  In that case, the plaintiff's employer had considered demoting him for performance-related reasons prior to the plaintiff engaging in protected activity.  *Id.* Because Robinson has pointed to no evidence of causation other than temporal proximity, the Court concludes she has failed to meet her prima facie case for retaliation.  *See also Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001) ("Employers … proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality.").  Thus, Armstrong is entitled to summary judgment on Robinson's retaliation claims.

### III. CONCLUSION

Armstrong is not entitled to summary judgment on Robinson's race discrimination claims because there is a genuine issue of fact as to whether Armstrong's asserted reasons for its action are a pretext for discrimination.  Armstrong is entitled to summary judgment on Robinson's retaliation claims because she has failed to establish a prima facie case.  Therefore, Armstrong's motion for summary judgment (Doc. 24) is **GRANTED in part and DENIED in part**.

**SO ORDERED,** this 10th day of July, 2014.

S/ Marc T. Treadwell
MARC T. TREADWELL, JUDGE
UNITED STATES DISTRICT COURT